JS-6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TIMOTHY O., ET AL.,

Plaintiffs,

v.

PASO ROBLES JOINT UNIFIED SCHOOL DISTRICT,

Defendant.

Case No. CV 12-06385-JGB (JEMx)

**ORDER**

**[Motion filed June 03, 2013]**

Before the Court is Plaintiffs’ Motion for Summary Judgment. (Doc. No. 46.) After reviewing and considering all papers filed in support of and in opposition to the Motion, and the arguments presented at the March 24, 2014 hearing, the Court DENIES Plaintiffs’ Motion for Summary Judgment.

# I. BACKGROUND

This case involves an appeal from an administrative ruling regarding certain public educational and related services that the Paso Robles Joint Unified School District ("District") provided to L.O., and the adequacy of those services under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, et seq. ("IDEA"). The parties participated in a nine-day administrative due process hearing before Administrative Law Judge ("ALJ") Rebecca Freie from March 19-23, 2012, March 28-30, 2012 and April 23, 2012. (Administrative Record ("AR") at 384.) The administrative hearing addressed whether, for the 2009-2010 school year ("SY"), 2010-2011 SY, and 2011-2012 SY,[1] the District denied L.O. a free appropriate public education ("FAPE") by failing to:

a. Appropriately assess him in all areas of suspected disability, specifically autism, and behavioral functioning for the 2009-2010 and 2010-2011 SYs;

b. Provide Parents with the notice of procedural safeguards at the individualized education program ("IEP") team meetings on December 4, 2009, May 28, 2010, October 15, 2010, and December 10, 2010;

[1] The Court refers to the beginning of 2011-2012 SY to December 23, 2011 as the "2011-2012 SY."

c. Make L.O. eligible for special education under the category of autistic-like behaviors for the 2009-2010, 2010-2011, and 2011-2012 SYs;

d. Offer L.O. goals and placement in the least restrictive environment ("LRE") that would meet his unique needs as a child with autism for the 2009-2010, 2010-2011, and 2011-2012 SYs;

e. Appropriately address L.O.'s behavioral issues by not providing him with a behavior support plan ("BSP") for the 2009-2010 and 2010-2011 SYs;

f. Provide him with appropriate speech and language services;

g. Offer him any placement or services for the extended school year ("ESY") 2010; or

h. Address maladaptive behaviors for the 2011-2012 SY.

(AR 385-36.) On June 1, 2012, the ALJ issued a decision finding for the District on all issues. (AR 385-441.)

On July 31, 2012, L.O. filed a complaint appealing the ALJ's decision. (Doc. No. 1.) On June 3, 2013, Plaintiffs filed a Motion for Summary Judgment. (Doc. No. 46.) Defendants opposed on October 15, 2013 (Doc. No. 58), and Plaintiffs replied on December 2, 2013 (Doc. Nos. 64, 65.)

## II. STANDARD OF REVIEW[2]

Under the IDEA, a school district's obligation to provide FAPE means it must (1) offer students with disabilities an IEP that is designed to (a) address their unique needs and (b) provide them a meaningful educational benefit in the least restrictive environment, and; (2) provide special education and related services that conform to the IEP. See Bd. of Educ. v. Rowley, 458 U.S. 176, 188-90 (1982); 20 U.S.C. § 1401(9). Students may challenge the provision of FAPE in state administrative hearings, and any party that is "aggrieved" by the decision of the hearing officer may bring a civil action in either state or federal court. 20 U.S.C. § 1415(i)(2). The party bringing such a civil action bears the burden of proof therein. Clyde K. v. Puyallup Sch. Dist., No. 3, 35 F.3d 1396, 1399 (9th Cir. 1994), *superseded by statute on other grounds as stated in* M.L. v. Fed. Way Sch. Dist., 342 F.3d 1052, 1063 n. 7 (9th Cir. 2003).

A district court reviews the decision of the ALJ under a modified *de novo* standard. Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471-73 (9th Cir.1993); Glendale Unified Sch. Dist. v. Almasi, 122 F. Supp. 2d 1093, 1100 (C.D. Cal. 2000). The scope of the civil

---

[2] Unless otherwise noted, all mentions of "Rule" refer to the Federal Rules of Civil Procedure.

action is defined by the IDEA, which provides that "the court shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The preponderance of the evidence standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206. Rather, the Court must give "due weight" to the administrative proceedings, which means that the district court should not try the case anew. Id.; Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891-92 (9th Cir. 1995). The Court "should give substantial weight to the hearing officer's decision if the court finds that the decision was careful, impartial and sensitive to the complexities presented." Ojai, 4 F.3d at 1476. The Court "must consider the findings of the hearing officer carefully and endeavor to respond to the hearing officer's resolution of each material issue." San Diego v. Cal. Special Educ. Hearing Office, 93 F.3d 1458, 1466 (9th Cir. 1996) (quoting Ojai, 4 F.3d 1473-44). However, the Court is free to accept or reject the findings of the hearing officer as a whole once such consideration is granted. Id. The district

court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference. Capistrano, 59 F.3d at 892.

## III. FACTS

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are “admitted to exist without controversy” for purposes of the MSJ. L.R. 56-3 (facts not “controverted by declaration or other written evidence” are assumed to exist without controversy); Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may “consider the fact undisputed for purposes of the motion”). All disputed facts are explicitly designated as such.

In March 2009, L.O. was found eligible to receive Early Start services. (Def. SUF ¶ 23.) When L.O. was 27 months old, he became a client of Tri-Counties Regional Center (“Regional Center”), where he was provided with early intervention services, including speech, language, and occupational therapy due to his developmental delays. (AR at 389.) In June 2009, a meeting took place with the Regional Center staff, District staff, and L.O.’s parent in attendance, during which both the Little PEPers (Parent Education

Preschool) and PAWS (Peers Are Wonderful Support) programs were discussed. (Def. SUF ¶ 26.) Once L.O. reached the age of three, his education became the responsibility of the District.

**2009 District Assessment**

When a student is suspected of having a disability, a school district is obligated to have him assessed. (AR at 390.) On October 30, 2009, a few weeks before L.O.'s third birthday, the District conducted an assessment of L.O. (Id.) The District was aware that the Regional Center suspected L.O. was autistic before it conducted its own assessment. (SUF ¶ 4.)

The assessment was conducted by Christie Youngdale, a District resource specialist, and Lisa Stinson, a District speech and language therapist. (AR at 390.) L.O.'s parents participated in the assessment. (Def. SUF ¶ 45.) Ms. Youngdale and Ms. Stinson observed L.O. for signs that he might have autistic-like behaviors, tried to engage him in play, and used other informal curriculum-based measurements. (Id. ¶¶ 43, 53.) Additionally, Ms. Stinson attempted to conduct standardized speech and language testing with L.O., but was unsuccessful. (Id. ¶ 44.) The District was not able to complete all of the testing it had originally intended to administer because L.O. was uncooperative. (SUF ¶ 6.)

During the assessment, a District school psychologist, William Peck, observed part of the testing in order to determine if additional assessment was needed with regard to autistic behaviors. (Def. SUF ¶ 33; AR at 390.) Mr. Peck did not observe indicators suggesting signs of autism. (Def. SUF ¶ 34.) He testified that he observed L.O. using a variety of facial expressions and displaying emotions, and that he was impressed when L.O. initiated and directed a ball-passing game with his parents. (Id. ¶¶ 47, 49.) Mr. Peck also indicated that L.O. displayed communicative intent, which he believed was significant because of its importance in predicting a student's needs and social skills development potential. (Id. ¶ 51.)

**Regional Center Assessment**

In November 2009, the Regional Center conducted a psychological assessment of L.O. The assessment was conducted by Linda Griffin, Ph.D., who obtained background information by reviewing the Regional Center's records, talking to L.O.'s Early Start therapist, and interviewing L.O.'s parents. (Def. SUF ¶ 61.) Dr. Griffin observed L.O. playing and attempted to use a standardized assessment tool to measure L.O.'s cognitive abilities, but was unable to do so successfully because of L.O.'s inattention and poor

reciprocal interaction. (Id. ¶ 63.) Dr. Griffin gave L.O. a provisional medical diagnosis of pervasive developmental disorder not otherwise specified ("PDD-NOS"). (Id. ¶ 55.) PDD-NOS is an autism spectrum disorder, but is not full-blown autism. (Id. ¶ 56.) Dr. Griffin recommended that L.O. receive speech and language therapy and a preschool program to help with language, social relating, cognitive development, and self-help skills for at least three days per week. (Id. ¶ 67.) She additionally recommended that L.O. should be re-evaluated in 18-24 months, prior to starting kindergarten, to determine whether he still met the criteria for PDD-NOS. (AR at 471.)

**2009-2010 School Year**

*Initial IEP*

An IEP team meeting was held on December 4, 2009. (Def. SUF ¶ 69.) It was attended by a representative from the Regional Center, L.O.'s parents, Ms. Stinson, Ms. Youngdale, and Mr. Peck. (Id. ¶ 70.) The District's contact log on December 2, 2009 reflects that the District received the Griffin Assessment, with Mr. Peck copied. (Id. ¶ 71.) The District's October 2009 Assessment was considered at the meeting. (Id. ¶ 72.) The Parties dispute whether the Griffin Assessment was considered at the meeting. The December

IEP does not mention the Griffin Assessment, autism, or autism spectrum disorder, and L.O.'s mother testified that the Griffin Assessment was never discussed at the meeting. (Tr. at 405:3-6.) However, Mr. Peck testified that the Griffin Assessment was considered at the December 2009 IEP meeting. (Id. at 689:1-3.) The ALJ found that the Griffin Assessment was considered. (AR at 392.) L.O.'s parents were active participants in the IEP meeting, had the opportunity to give input on the proposed goals, and consented to the IEP in its entirety at the conclusion of the meeting. (Def. SUF ¶¶ 76-78, 86.) The IEP governed the 2009-2010 school year. (Id. ¶ 84.)

The IEP identified L.O.'s areas of need as: pre-academic, fine motor and gross motor, behavior, social, communication, and self-help. (Id. ¶ 79.) These areas of need are consistent with the areas of need discussed in Dr. Griffin's assessment. (Id. ¶ 81.) Mr. Peck testified that he would not have identified different areas of need even if L.O. had been given an eligibility of autism. (Id. ¶ 83.) To address these areas of need, the IEP team created nine annual goals for L.O. (Id. ¶¶ 85, 87.) In the area of communication, the goals were: an expressive language goal, a receptive language goal, and an articulation or sound goal. (Id. ¶ 88.) The expressive language goal provided that L.O. would combine words into three word

phrases to make comments and requests in two out of three opportunities; the baseline level of performance for this goal was that he have a limited vocabulary estimated at 15 to 20 words, and used other nonverbal means to communicate. (Id. ¶ 89.) The IEP stated that "[d]ue to the child's changing needs and individual response to therapy, adjustments may be made based on teacher recommendation and parent agreement." (Id. ¶ 126.)

Mr. Peck testified that at the time the 2009 IEP was developed, he believed it was the appropriate program to meet L.O.'s needs. (Id. ¶ 122.) Additionally, District staff testified that they would not have made different recommendations for L.O. if he had been eligible under the category of autistic-like. (Id. ¶ 123.)

*Little PEPers Class*

L.O. was offered group speech and language services for 25 minutes, seven times a month during the time he attended preschool. (Id. ¶ 111.) The IEP team decided that L.O. would begin attending Little PEPers. (Id. ¶ 113.) The Little PEPers preschool met two days a week for 1.5 hours each day. Eight to ten children attended the class and all of the children had special needs. The Little PEPers program worked in part on communication skills, social readiness, gross motor,

fine motor, and self-help skills. The class was taught by Ms. Stinson and Ms. Youngdale, and parents were expected to work with the children; there was a parent participation portion, during which adults would be engaged with the children, and a parent education component when adults were separated from the children. Parents were not required to participate. (AR at 392-93; Def. SUF ¶ 118.)

The speech therapist testified that she worked with L.O. twice a week, as required by the IEP. (Id. ¶ 127.) L.O. had difficulty separating from his mother when parents were expected to leave the children and go to the parent education area. (Id. ¶ 128.) Ms. Stinson used several strategies to help L.O. separate from his mother, which were sometimes successful, but often were not successful. (AR at 394.) L.O.'s mother also testified that he engaged in many other problematic behaviors in the Little PEPers class, but Ms. Stinson did not identify any problematic behaviors other than difficulty separating from his mother. (Def. SUF ¶ 130.)

Ms. Youngdale and Ms. Stinson monitored L.O.'s progress in the Little PEPers program to determine whether his program needed adjustment. (Id. ¶ 135.) On February 10, 2010, after L.O. had attended 12-14 sessions of Little PEPers, Ms. Youngdale explained to L.O.'s mother that although L.O. was making some

progress in Little PEPers, the District believed he would make more progress in a more intensive program (i.e., the PAWS program), in part because he would be attending the program five days a week, for a total of 15 hours, rather than two sessions a week, for a total of three hours. (Id. ¶ 136.) L.O.'s mother told Ms. Youngdale that she would discuss the proposed change with L.O.'s father, but L.O.'s father testified that he had no recollections of the District or his wife discussing a more intensive placement in February 2010. (Id. ¶¶ 137, 138.) L.O. continued in the Little PEPers program. The ALJ found that the evidence established that L.O. was kept in the Little PEPers program in part because L.O.'s parents were concerned about the separation issues, and PAWS was not a parent-participation program. (Id. ¶ 139.)

*May Progress Report*

L.O.'s May progress report reflects the following progress:

| December 2010 Goal | Baseline | Progress |
|---|---|---|
| Expressive Language: combine words into 3 word phrases to make comments and requests, 2 out of 3 times | Limited vocabulary estimated at 15-20 words. Uses words, signs, gestures, and pointing to communicate. | Imitating more words, but language still limited |

| | | |
|---|---|---|
| Receptive Language: identify two items named in a field of five with 80% accuracy | Can follow routine commands and one step directions in small field. Difficulty identifying two items named and receptive vocabulary suspected to be weak | Difficulties still noted |
| Speech: produce/imitate consonant-vowel-consonant-vowel target words that include age appropriate sounds with 80% accuracy | Limited ability to imitate sounds and words | Imitation improved, but still limited |
| Social: say name when asked, 3 out of 3 times | Has idea of turn taking and attempts to ask mom questions, but does not state name | Says utterance for his name, which is not his name, but a television show character |
| Self help: void in toilet two times per day following daily schedule | If marked, will use toilet | Staying dry for weeks at a time, but was recently having accidents again |
| Fine Motor: copy vertical and horizontal line, and circle, 3 out of 4 times | Not yet imitating simple shapes | Often refuses |
| Gross Motor: trap a thrown playground ball from five feet, 3 out of 4 times | Did not trap playground ball bounced from three feet, 3 out of 5 times | Often refuses |

| | | |
|---|---|---|
| Pre-academic: count 1-5 objects, 3 out of 4 times | Does not count with number words, but makes counting rhythm | Does not count |

(AR 807-812.)

*May 2010 IEP*

In April 2010, L.O.'s parents took him to Disneyland for three days. L.O. was very anxious about the noise and the crowds, he did not want to go on most of the rides, and he refused to get off of the rides he liked. (Def. SUF ¶¶ 140-141.) After the trip, L.O.'s mother met with Ms. Stinson, expressed concern that L.O. might be autistic, and expressed interest in moving forward with the PAWS program. (Id. ¶ 140.)

An IEP meeting was held on May 28, 2010. (Id. ¶ 145.) The meeting was attended by Ms. Stinson, Ms. Youngdale, Mr. Peck, another District representative, and the transportation supervisor for the District. (Id. ¶ 146.) The District found that PAWs was a more suitable placement and offered PAWS for the next school year. (Id. ¶ 148.) The District and L.O.'s parents decided that L.O. should continue in the Little PEPers program to the end of the school year in June 2010. (Id. ¶ 147.)

**2010 Extended School Year**

The December 4, 2009 IEP indicates that the Extended School Year ("ESY") was discussed at the team meeting; there is a checked box that ESY was not recommended. (Id. ¶ 175.) Ms. Stinson testified that she did not expect that L.O. would regress over the summer in 2010. (Id. ¶ 174.) Ms. Stinson encouraged L.O.'s mother to seek out private speech and language therapy that could be covered by the family's health insurance. (AR at 407.)

During the summer of 2010, L.O.'s parents sought out speech and language therapy services, and the services of a behaviorist. (Def. SUF ¶ 176.) Additionally, L.O. was privately evaluated by a speech and language pathologist, an occupational therapist, and a neurologist. (Id.)

**May 2010 Private Assessment**

One day prior to the May 28, 2010 IEP, L.O. was informally assessed by Pamela Reading, a speech and language pathologist in private practice, for insurance company coverage purposes. (Id. ¶ 170.) L.O.'s parents did not mention Ms. Reading's assessment at the May 28, 2010 IEP meeting. (Id. ¶ 171.) In her written report, Ms. Reading indicated that she asked L.O.'s parents to provide her with assessment reports

completed by the District, and she would conduct a formal speech and language assessment if one had not been completed in the previous six months. (Id. ¶ 173.)

**2010 – 2011 School Year**

Pursuant to the May 2010 IEP, L.O. was to be placed in Eileen Higgins's class for the 2010-2011 SY, for his second year of preschool.[3] (Id. ¶ 177.) Instead, L.O.'s parents decided to keep him at home and use the private services of a behaviorist. They notified the District by telephoning Ms. Higgins. (Id. ¶ 178.)

In October 2010, L.O.'s IEP was amended, with his parents' consent, to reflect that he would attend a preschool class taught by Noah Cooper at Winifred Pifer Elementary School. (Id. ¶¶ 179, 180.) Mr. Cooper was qualified and credentialed to teach preschool children with autism. (AR at 933.) Mr. Cooper's class had approximately eight students, and was designed for children with mild to moderate disabilities, including students with autism and students with an eligibility category of autistic-like. (Def. SUF ¶¶ 180-182.) Children with various eligibility categories attended the class. (Id. ¶ 226.) Students in Mr. Cooper's class worked on pre-academic curriculum, developing

[3] The class had been previously known as the PAWS program. (AR at 407.)

pre-teaching skills, developmental functional play skills, and reciprocal play. (Id. ¶ 183.) The class incorporated various positive and proactive behavioral strategies and was structured to facilitate participation and minimize problematic behaviors, including visual schedules, reinforcements, modeling of appropriate behaviors, and communication boards. (Id. ¶ 184.) The class integrated with typical peers for a period of time on Wednesdays. (Id. ¶ 185.) The District autism specialist worked with students in this class based on needs and eligibility of autistic-like behaviors. (Id. ¶ 187.)

L.O. began attending Mr. Cooper’s class on November 1, 2010. (Id. ¶ 188.) Although the class was in session Monday through Friday, L.O. did not attend class on Wednesdays. (Id. ¶ 234.) While L.O. consistently clung to his mother when she dropped him off and cried for 20-30 minutes during the first couple days, after the third day he would go to his schedule posted on the wall, check it, and go where he was supposed to be. (Id. ¶ 189.) L.O. spoke very little in class; he occasionally spoke to staff and occasionally whispered to peers, but would immediately stop whispering if he saw an adult approach. (AR at 599.) Because the District staff though L.O. may be suffering from selective mutism, Mr. Cooper, the District speech therapists, and classroom aides worked

to create an environment where L.O. would not feel pressured to speak. (Tr. 1387:21-1388:9.) For example, they allowed L.O. to remain in his seat when other children were expected to stand in front of the class. (Id.)

*December 2010 IEP*

An annual IEP team meeting was held on December 10, 2010. The IEP team found L.O. eligible as a child with speech and language impairment. (Id. ¶ 213.) The District staff believed that the 2010 IEP accurately described L.O.'s needs. (Id. ¶ 216.) The IEP offered goals in the found areas of need, and included short term objectives, which the team discussed during the meeting. (Id. ¶ 219.)

The meeting was attended by L.O., his parents, Mr. Cooper, and Mr. Peck. L.O.'s parents were active participants at the IEP team meeting. (Id. ¶¶ 190, 191.) At the time of the meeting, L.O. had spent approximately 15 school days in Mr. Cooper's class. (Id. ¶ 198.) The IEP team expressed concerns that L.O. was not talking in class to either adults or peers, although he was communicating by means of gestures and some body language. (Id. ¶ 199.) Mr. Peck, Mr. Cooper, and Ms. Castro, a speech therapist, questioned whether L.O.'s lack of verbal communication was "selective mutism." (Id. ¶ 201.) At the meeting, Mr.

Cooper reported his observation of L.O.'s progress towards the December 2010 IEP goals. (Id. ¶ 214.)

The IEP included a behavior goal of compliance and reflected that L.O. was making minimal progress on the goal. (Id. ¶ 204.) During the meeting, L.O.'s parents reported that L.O. had tantrums at home, which included crying and some aggressive behaviors such as hitting and kicking when he got out of his routine at home. (Id. ¶ 207.) L.O. did not engage in any of those behaviors at school. (Id. ¶ 208.) Mr. Cooper did not believe a behavior plan or referral to a behavior specialist was necessary at the December 2010 IEP meeting as he was still getting to know L.O. and L.O. was responding to classroom interventions. (Id. ¶¶ 205, 210.) Both Mr. Cooper and Mr. Peck advised that the best approach was not to pressure L.O. into speaking, but, rather, focus on making him feel comfortable in the school environment. At the meeting, L.O.'s parents did not specifically express their concern with L.O.'s autism, although L.O.'s father testified that they expressed concern with L.O.'s autism by expressing concerns over his behavior. (Id. ¶¶ 211, 212.)

The December 2010 IEP offer called for L.O. to continue to be placed in Mr. Cooper's class, and to receive seven 25-minute sessions of group speech and therapy. (Id. ¶ 220.) L.O.'s parents did not sign the

IEP, stating that they wanted to take it home to review before signing it. (Id. ¶ 221.)

*School Behavior Specialist*

In March 2011, L.O.'s mother discussed L.O.'s home behaviors with Mr. Cooper. (Id. ¶ 251.) After the meeting, Mr. Cooper spoke to the school psychologist and made a referral to the school behavior specialist, Jessica Munoz. (Id. ¶ 252.) Ms. Munoz spoke to L.O.'s mother in early May 2011 and told her that she would observe L.O. in class, and discussed the possibility of home support from a local mental health agency to address behavior concerns. (Id. ¶ 258.) Ms. Munoz testified that the behaviors L.O.'s mother described during this conversation were not beyond those expected for a child L.O.'s age, particularly one who had difficulty communicating verbally. (Id. ¶ 259.) L.O.'s mother testified that she was troubled by the idea of mental health support for him because she thought mental health support was for older, troubled kids. (Id. ¶ 267.)

*March 2011 and June 2011 Progress Reports*

L.O.'s progress reports in March and June 2011 reflect the following progress:

| **December 2011 Goal** | **March 2011 Progress** | **June 2011 Progress** |
|---|---|---|
| Expressive Language/Speech: spontaneously use one or more words with staff member to request, greet, comment, or answer 4 of 5 opportunities over 2 consecutive observation days | Satisfactory. Making progress with expression at school. Participating much more and will vocalize to answer a question, along with a head nod. Does not use words to communicate to staff at school, but uses vowel or short sound combination. Uses picture icons to communicate choices at meal times. | Satisfactory. Using more sophisticated vocalizations when communicating with staff. Observed counting with staff member and numbers were audible and fairly intelligible. Has been overheard saying words to peers but stops when staff comes closer. Uses picture icons to communicate choices during meal times. |
| Receptive Language: identify two items named in a field of five with 80% accuracy | Outstanding. Able to identify items in a filed with 100% accuracy by pointing or giving over an item. | Outstanding. Shown mastery of goal. |
| Compliance: comply and attend teacher directed activities by sitting in desired area, looking at teacher, and participating in crafts or activities for | Satisfactory. Will comply and attend teacher directed activity by sitting in desired area and looking at teacher, but difficulty participating for five minutes independently. | Satisfactory. Significant progress. Able to attend teacher directed activities for at least 15 minutes and independently check his schedule. Participates more |

| | | |
|---|---|---|
| ten minutes independently | Will participate in some activities for more than five minutes but becomes shy when individual attention is directed towards him. | during circle time, needs to continue to work on compliance with tasks that make him feel uncomfortable, such as speaking in an audible voice and participating when peers are watching. Becoming less shy about participating in front of peers. |
| Social: say name when asked, 3 out of 3 times | Minimal. Will not say name 1 out of 3 times. Very shy, but slowly becoming less shy in certain situations and makes little noises when excited | Minimal. Begun making more audible vocalizations at school and does not feel comfortable saying his name in front of adults or peers. Can become shy and will refuse to respond in an audible voice if he feels uncomfortable. |
| Self help: void in toilet two times per day following daily schedule | Outstanding. Void in toilet one time per day following a daily schedule, and several other times a day. Closes door completely while | Outstanding. Independently goes into bathroom and uses toilet twice a day when prompted. Closes door while using |

| | | |
|---|---|---|
| | using bathroom, but is independently using toilet without assistance. | toilet and needs verbal prompting when he forgets to wash his hands after using the toilet or flushing. |
| Fine Motor: copy vertical and horizontal line, and circle, three out of four times | Satisfactory. Will trace lines and circle1 out of 4 times with hand over hand assistance. Can sometimes trace independently, but pressure on paper is light. | Satisfactory. Can independently trace name 2 out of 4 times. Does not always trace directly over the lines and struggles most with circular lines. Uses four finger grasp and switches hands while tracing lines. |
| Gross Motor: trap a thrown playground ball from five feet, 3 out of 4 times | Satisfactory. Will trap ball from three feet, 3 out of 4 times. Can throw ball back. Is only unable to trap ball when he does not like the attention he gets during teacher directed obstacle course. | Outstanding. Able to trap ball even in social situations from five feet, 2 out of 4 times. |
| Pre-academic: count 1-5 objects, 3 out of 4 times | Satisfactory. Counts 1-3 objects in 2 out of 4 opportunities, but speech is unintelligible. Knows 1-3 and can show amount he has | Outstanding. Able to count in audible voice up to at least 12. Speech is a little difficult to understand, but will count |

| | | |
|---|---|---|
| | counted on his fingers. Makes a sound that is not that name of the numbers as he touches objects. | aloud with familiar adult at school. |

(AR at 596-600.)

**January 2011 Private Assessments**

In January 2011, Ms. Sullivan, a behavior specialist, privately assessed L.O. (Id. ¶ 236.) As part of the assessment, Ms. Sullivan observed L.O. in Mr. Cooper's class, which was being covered by a substitute teacher the day she observed. (Id. ¶¶ 237, 238.) Ms. Sullivan did not revisit the classroom or speak with the District staff or Mr. Cooper after her observation. (Id. ¶¶ 244, 246.)

In January 2011, L.O. was privately assessed by Dr. Freeman, who found L.O. to qualify for the DSM IV diagnosis of Autistic Disorder, and made several recommendations. (Id. ¶¶ 262-64.) Dr. Freeman did not speak with L.O.'s teachers or the District staff, and she did not know what strategies were being used in the classroom. (Id. ¶¶ 265, 266.) L.O.'s parents did not share either Ms. Sullivan's assessment report or Dr. Freeman's assessment report with the District. (Id. ¶ 249.) L.O.'s mother testified that she shared with Mr.

Cooper and Ms. Castro in April 2011 that L.O. had been diagnosed with autism. (Id. ¶ 276.)

**January 2012 District Assessment**

On February 3, 2011, the District decided to complete its own assessment and offered L.O.'s parents an assessment plan calling for assessments in the areas of: pre-academic achievement, social/adaptive behavior, sensory-motor development, communication development, intellectual development, health and developmental history, classroom observation, and a record review. (Id. ¶ 268.) Parents did not return the signed assessment plan until May 2, 2011. (Id. ¶ 270.) L.O.'s mother testified that she delayed signing the District assessment plan because L.O. had a difficult time being assessed. (Id. ¶ 277.)

Mr. Peck was given access to L.O. to complete the assessment on December 8, 2011. He completed the assessment report on January 15, 2012. (Id. ¶¶ 282, 283.) In the assessment, Mr. Peck found that L.O. had social delays as a result of his not speaking in the school setting, and L.O. manifested two autistic-like behaviors. However, Mr. Peck also found that he did not find L.O. extremely withdrawn in other aspects. (Id. ¶ 285.) Mr. Peck determined that L.O. met the California criteria for eligibility as a child with autistic-like behaviors. (Id. ¶ 284.)

**2011-2012 School Year**

In July 2011, L.O.'s parents filed a due process complaint. Subsequently, L.O.'s parents wrote the District a letter, informing them that they were withdrawing L.O. from the District. (Id. ¶ 307.) They stated that they intended to obtain private services for L.O. from a nonpublic agency, Autism Connections, and they would be seeking reimbursement of these services. (Id.) L.O.'s parents' reasons for removing L.O. from the District included the fact that they had expressed concerns about the lack of intensive behavioral programs and L.O.'s behavior was getting worse. (Id. ¶ 308; AR at 616.)

On August 22, 2011, Ms. Murphy, the District's special education director, wrote a letter to L.O.'s parents requesting the opportunity to convene an IEP meeting to discuss placement and services for the 2011-2012 school year, as well as discuss allowing the District to complete ongoing assessments of L.O. L.O.'s parents were invited to observe the Emerging Communication and Social Skills Preschool classroom. (Def. SUF. ¶ 309.) Ms. Murphy sent L.O.'s parents a follow-up letter on August 31, 2011, requesting the opportunity to convene an IEP to discuss appropriate placement and services, including behavioral services, following L.O.'s parents' visit to the Emerging

Communication and Social Skills Preschool classroom. (Id. ¶ 315.)

After L.O.'s mother and Ms. Sullivan visited the classroom the District was proposing to place L.O. on September 2, 2011, they decided that the class was not appropriate because (1) it was in the same physical classroom where Mr. Cooper's class had been held the previous year and they believed L.O. would make that association, which would trigger L.O. to behave as he had in Mr. Cooper's class, including not speaking and partial compliance, and (2) they believed it was not possible to provide L.O. with the intensity of services he required in a classroom setting. (Id. ¶ 313; Tr. 1838:25-1839:4.)

Ms. Sullivan conducted an in-home assessment of L.O. in September 2011 for 4.5 hours over two days. (Id. ¶ 326.) L.O.'s parents had reported to Ms. Sullivan that L.O. was having a tantrum at least once a day at home, but Ms. Sullivan did not observe any tantrums. (Id. ¶¶ 325, 326.) Ms. Sullivan's report indicated that L.O. does not usually use verbal language to meet his needs, but he would readily speak with his parents. (AR at 628.)

On September 9, 2011, L.O.'s mother wrote to Ms. Murphy, stating that she would contact her, or the District's attorney, the following week. (AR at 883.) The Parties attended mediation in October 2011. (Tr.

289:24-290:5.) In November 2011, after the failed mediation, the District sent L.O's parents a letter requesting an IEP meeting in December 2011. (AR at 886.)

L.O.'s parents made him available to complete the District assessment in December 2011. (Def. SUF ¶ 318.) Mr. Peck completed the assessment report in January 2012. (Id. ¶ 319.) In his assessment report, Mr. Peck found that L.O.'s eligibility category should be changed from speech and language impaired to autistic-like behaviors, based on the definitions under California law. (Id. ¶ 320.) Mr. Peck observed L.O. at home in February 2012, when two staff members from Autism Connection were present. (AR at 911.) His notes reflect that many of the interventions being used in the home setting were consistent with those used in the school setting, but he did not think the home program addressed L.O.'s social needs. (Id. at 911-913.)

## IV. DISCUSSION

### A. Deference to ALJ's Analysis

A district court gives deference to an ALJ's decision "when it 'evinces [her] careful, impartial consideration of all the evidence and demonstrates [her] sensitivity to the complexity of the issues presented.'" Country of San Diego v. California

Special Education Hrg. Off., 93 F.3d 1458, 1466 (9th Cir. 1996). A court "treat[s] a hearing officer's findings as 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions." R.B. v. Napa Valley Unified Sch. Dist., 496 F.3d 932, 942-43 (9th Cir. 2007).

In this case, the ALJ presided over the nine-day hearing and was actively involved in questioning. In the 58 page decision, the ALJ provides detailed factual background and analysis, as well as cites to the relevant facts to support her legal conclusions. Accordingly, the Court gives due weight to the ALJ's findings and conclusions that are well-reasoned and supported. See W.H. ex rel. B.H. v. Clovis Unified School Dist., No. 08-0374, 2009 WL 1605356, at *14 (E.D. Cal. June 8, 2009.)

**B. Credibility Determinations**

"Normally, a finder of fact's determination of credibility receives deference on appeal, because access to live testimony is important to the credibility finding." Ms. S. ex rel. G. v. Vashon Island Sch. Dist., 337 F.3d 1115, 1127 (9th Cir. 2003); see also Amanda J. ex rel. Annette J. v. Clark County Sch. Dist., 267 F.3d 877, 889 (9th Cir. 2001) (finding

that in the IDEA context, an administrative hearing officer "who receives live testimony is in the best position to determine issues of credibility"). "A district court should accept the ALJ's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'" K.S. ex rel. P.S. v. Fremont Unified School Dist., 545 F. Supp. 995 (N.D. Cal. 2008) (quoting Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir.2004)). "Nonetheless, a district court is not required to accept any findings by the ALJ which are arbitrary and capricious or an abuse of [her] discretion." Id. (citing Aguilera-Cota v. INS, 914 F.2d 1375, 1381 (9th Cir.1990).

**C. Violation of Procedural Rights**

"A state must comply both procedurally and substantively with the IDEA." M.L. v. Fed. Way Sch. Dist., 394 F.3d 634, 644 (9th Cir. 2005). "Compliance with the IDEA procedures is 'essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important.'" N.B. v. Hellgate Elementary School Dist., ex rel. Bd. of Directors, Missoula County, Mont., 541 F.3d 1202, 1208 (9th Cir. 2008) (quoting Amanda J. ex rel Annette J. v. Clark county Sch. Dist., 267 F.3d 877, 891 (9th Cir.

2001)). "Not every procedural violation, however, is sufficient to support a finding that the child in question was denied a FAPE. Technical deviations, for example, will not render an IEP invalid. On the other hand, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE." Amanda J., 267 F.3d at 892.

Pursuant to the IDEA and California's Education Code, students must be tested in all areas of his or her suspected disability. 20 U.S.C. § 1414(b); Cal. Educ. Code § 56321(f). A school district's failure to assess in all areas of suspected disability may constitute a procedural denial of a FAPE if it results in the loss of educational opportunity or benefits to the student or seriously infringes on the parents' opportunity to participate in the IEP process. Park v. Anaheim Union High School Dist., 464 F.3d 1025, 1031-33 (9th Cir. 2006); W.G. v. Bd. of Trustees of Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992).

L.O. argues that the District did not comply with the procedural requirements under the IDEA because the District did not assess L.O. for all areas of suspected disability during the initial assessment and continued to fail to appropriately asses L.O. during the 2010-

2011 school year, which was fatal to the development and delivery to FAPE.

**1. Initial Assessment**

First, Plaintiffs contend that, prior to the initial assessment, the District knew, through the Griffin Assessment and its own assessment notes, that L.O. was suspected of having an autism spectrum disorder and, therefore, the District was obligated to conduct an assessment for eligibility on the basis of autistic-like behaviors. (MSJ at 11-14.) The District responds that it met its statutory obligation by conducting a thorough assessment and determining that no additional assessments were needed because it believed all areas of need had been identified. (Opp. at 29-31.) On this issue, the ALJ concluded that Plaintiffs failed to meet their burden of proof that the District should have assessed L.O. for autism during the initial assessment because the Griffin Assessment was comprehensive and thorough, and even if it were found that the District was required to conduct its own assessment, the evidence did not establish that the District’s failure was anything more than harmless error. (AR at 427.)

In support of their argument, Plaintiffs rely primarily on N.B v. Hellgate Elementary School Dist., 541 F.3d 1202 (9th Cir. 2008). In Hellgate, prior to

moving to the school district, a doctor who examined the student concluded that an autistic component appeared to be complicating the student's performance. After being apprised of the doctor's diagnosis, the school district referred the student's parents to a center for free autism testing rather than arranging for an evaluation. The school district did not have personnel qualified to conduct an autism evaluation. The Ninth Circuit found that the school district did not fulfill its statutory obligations by just referring the student's parents to the center, as "[s]uch an action does not 'ensure that the child is assessed,' as is required by 20 U.S.C. § 1414(b)(3)(C)." Id. at 1209.

The Court agrees with the District that it fulfilled its statutory obligations for L.O.'s initial assessment. While in Hellgate the school district found that an autism evaluation was necessary, which prompted it to refer the student's parents to the center, here the District found that additional testing was unnecessary after the October 2009 assessment. The District knew that the Regional Center suspected that L.O. may be autistic, and sent Mr. Peck to observe part of the testing in order to determine whether additional testing was needed. (SUF ¶ 4; Def. SUF ¶ 33.) The ALJ found that Mr. Peck testified credibly that when he observed, L.O. used a variety of facial expressions,

displayed emotions, did not appear extremely withdrawn, and did not seem inordinately attached to his parents. Ms. Youngdale and Ms. Stinson also assessed L.O.'s behavior and demeanor for signs that he might require additional assessment, but did not observe obvious characteristics seen in a child with autism. (AR at 391.) The Court is not aware of any authority that supports that where the school district is on notice that a student may be on the autism spectrum, observes the student, and determines that he did not exhibit any characteristics of autism, that the district is still required to complete additional testing.

The Court also agrees that even if the District was required to complete additional testing, the fact that the District did not complete the additional testing did not affect L.O. or his parents' substantive rights under the IDEA. There is no reference to the Griffin Assessment of its finding in the IEP document. However, the District presented evidence that the District received the Griffin Assessment,[4] which diagnosed L.O. with PDD-NOS and made appropriate recommendations based on this diagnosis, prior to the December 2009 IEP meeting and relied on it in developing the IEP. Additionally, as discussed below, L.O. was not denied any educational opportunity or

---

[4] The Parties agree that the Griffin Assessment was comprehensive and thorough.

educational benefits during the 2009-2010 and 2010-2011 SYs.

**2. 2010-2011 School Year Assessment**

*Reassessment*

Second, Plaintiffs assert that the District continued to fail to appropriately assess L.O. because the initial assessment was inadequate and the District had reason to reassess L.O., which prevented the District from providing L.O. a meaningful education program and made the progress on his goals illusory since it did not have a clear understanding of L.O.'s needs and abilities from the initial assessment. (MSJ at 24-26.) The District responds that at the date of L.O.'s December 4, 2010 IEP meeting, Mr. Cooper wanted additional time with L.O. to determine whether additional assessments were needed, and it did seek a reassessment of L.O. in February 2011, but the L.O.'s parents did not return the assessment plan until May 2011. (Opp. at 35-36.)

The IDEA provides for periodic reevaluations to be conducted not more frequently than once a year, unless the parents and school district agree otherwise, but at least once every three years unless the parents and school district agree that a reevaluation is not

necessary. 20 U.S.C § 1414(a)(2)(B); Ed. Code, § 56381(a)(2). A reassessment may also be performed if warranted by the child's educational or related services needs. 20 US.C § 1414(a)(2)(A) (i); Ed. Code. § 56381(a)(1). Reassessments require parental consent. 20 U.S.C § 1414(c)(3); Ed. Code. § 56381(f)(1). If the parents do not consent to a reassessment plan, the school district may conduct the reassessment by showing at a due process hearing that it needs to reassess the student and it is lawfully entitled to do so. 20 U.S.C § 1414(c)(3); Ed. Code. § 56381(f)(3).

Here, the record does not demonstrate that the District violated L.O.'s procedural rights by not reassessing him before January 2012. Plaintiffs have not provided any authority supporting that a reassessment was warranted under the facts of this case. L.O.'s parents never requested a reassessment, and actually contributed to the delay of L.O.'s reassessment by not returning the proposed assessment plan the District sent in February 2011 until May 2011 and by not making L.O. available until December 2011. Additionally, as the ALJ noted, L.O. did not begin in Mr. Cooper's class until November 2010, there were several days of holidays shortly thereafter, and it was not unreasonable for Mr. Cooper to want to observe L.O. for a while longer to determine what testing should be done. Furthermore, the District staff did take note of

L.O.'s limited speech in class, which is partially why he was placed the more intensive PAWS program, during the 2010-2011 SY. As discussed below, the District did not deny L.O. any educational opportunity or benefit by making him eligible for special education under the category of speech and language impairment, rather than autistic-like behaviors, for the 2010-2011 SY.

*Functional Behavioral Assessment*

Third, Plaintiffs argue that L.O.'s reluctance to speak impeded his ability to learn and the District should have completed a functional behavioral assessment ("FBA") in order implement a behavioral support plan ("BSP"). (MSJ at 28-29.) They argue that because L.O. did not speak, he could not ask questions when he did not understand, could not answer questions to demonstrate what he had learned, and could not benefit from speech services.

Plaintiffs cite to Student v. Garden Grove Unified School District, OAH Case No. 20050706363 (Sept. 27, 2006), for support. In Garden Grove, the student was diagnosed with selective mutism, which was caused by anxiety and student would shut down and refuse to participate in class for varying lengths of time. The student's anxiety level fluctuated according to how

difficult the work was to him. As a result, the IEP team decided to have the student repeat the first grade so he could stay calm, which the team felt would help him meet the state's academic standards. However, the student continued to have academic and anxiety problems during the early part of his repeated year and his episodes of selective mutism and shut downs continued. The ALJ found that the school district had sufficient knowledge that the student's behavior was not sufficiently addressed by the middle of the repeated first grade year, and should have conducted additional assessments regarding his anxiety-related behaviors.

Plaintiffs have not demonstrated that under the facts of this case, the District was required to conduct an FBA. There is no evidence that L.O. was not able to participate in class in a way that prevented him from learning. In fact, there is evidence that L.O. did participate in class (see Def. SUF ¶ 189) and that he progressed in his speaking over the school year. The March and June 2011 progress reports show that L.O. was making satisfactory progress, and by June he was counting audibly with staff members and using more sophisticated vocalizations when communicating with staff.

**3. Autistic-Like Eligibility**

Fourth, Plaintiffs argue that the District's failure to make L.O. eligible as autistic-like violated his procedural rights under the IDEA. (MSJ at 36-37.) The IDEA was enacted to "ensure that all children with disabilities have available to them . . . a free appropriate public education . . . ." 20 U.S.C. § 1400(d)(1)(A). Thus, the question here is whether the application of the IEP denied L.O. a FAPE, not the precise label the District applied. See M.M. v. Lafayette School Dist., Nos. 09-4624, 10-4223, 2012 WL 398773, at *17 (N.D. Cal. Feb. 7, 2012). "The IDEA charges the school with developing an appropriate education, not coming up with a proper label with which to describe [a student's] multiple disabilities. Heather S. v. Wisconsin, 125 F.3d 1045, 1055 (7th Cir. 1995); see also D.B. ex rel. C.B. v. Houston Independent Sch. Dist., No. 06-0354, 2007 WL 2947443, at *10 (S.D. Tex. Sept. 29, 2007) ("Failure to identify (or agree with) a particular disorder is not a per se denial of a FAPE as long as individualized services are being provided."). As discussed below, the Court does not find that the District's failure to classify L.O. under the autistic-like eligibility category denied L.O. a free and appropriate education.

**4. Summer 2010 ESY**

Finally, Plaintiffs argue that the District committed a procedural violation of the IDEA by failing to discuss the ESY at L.O.'s May 2010 IEP meeting. (MSJ at 39.) The ALJ found that the December 2009 IEP, which checked that ESY is not recommended, indicates that it was discussed at the team meeting on that date. (AR at 407.) Additionally, the ALJ found that L.O. did not establish that he needed ESY services, and, therefore, the District's lack of an offer for 2010 ESY did not deny L.O. a FAPE. (Id.) Plaintiffs do not offer any evidence that the ESY was not discussed at the December 2009 IEP meeting, only arguing that the checked box does not conclusively show that it was discussed then.

Plaintiffs do not cite to any authority suggesting that the ESY must be discussed at the last IEP meeting before the summer started; they rely on Ms. Murphy's testimony that the ESY is normally discussed during the IEP meeting before the summer starts to impose this requirement. In light of the fact that the 2010 ESY was discussed at the December 2009 IEP meeting, Ms. Stinson discussed ESY with L.O.'s mother a few months later, and the District staff did not believe L.O. would regress over the summer, the Court finds that the evidence does not support that the District committed a

procedural violation by failing to discuss the ESY at the May 2010 IEP meeting.

**D. Substantive Violation of IDEA**

**1. 2009-2010 School Year**

**Little PEPers Language Class**

Plaintiffs argue that: (1) the District denied L.O. a FAPE by failing to develop appropriate goals; (2) L.O. did not obtain any meaningful educational benefit while in the Little PEPers class, and (3) L.O. should have received more hours per week of services. They cite to L.O.'s May 2010 progress report for the communication area of need as demonstrating L.O.'s lack of progress, as well as L.O.'s teacher's testimonies that L.O. needed more intensive services to make adequate progress for his goals. (MSJ at 19-21.) The District contends that the interventions used in the Little PEPers program were designed with the need of various students, including those with speech issues or autism needs, and were offered to L.O. based on his unique needs. (Opp. at 19.) The ALJ rejected Plaintiffs' argument and determined that the evidence established that the Little PEPers program was appropriate because L.O. acquired learning-to-learn skills from the program, he made some progress on some goals during the school year, he was able to improve

his socialization skills through interaction with his peers; and the placement was much less restrictive. (AR at 433.)

"While a student's IEP must be reasonably calculated to provide him or her with educational benefit, school districts are required to provide only a 'basic floor of opportunity.'" J.W. ex rel. J.E.W. v. Fresno Unified School Dist., 626 F.3d 431, 439 (9th Cir. 2010) (quoting Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 200-201 (1982)). A FAPE does not need to provide the absolute best of potential maximizing education for a student. Fresno, 626 F.3d at 439. The Court focuses on whether the IEP was appropriately designed and implemented so as to convey the student with meaningful benefit. Adams v. State of Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999). The FAPE need only be "appropriately designed and implemented so as to convey [the] [s]tudent with a meaningful benefit." Fresno, 626 F.3d at 433 (citations and quotation marks omitted). Furthermore, in considering whether an IEP was adequate, the standard is not retrospective. Id. at 390.

After reviewing the Parties arguments and the evidence cite, the Court agrees with the ALJ's conclusion. Ms. Sullivan and Dr. Freeman disapproved of the goals listed in the IEP. However, Dr. Freeman and Ms. Sullivan based their opinions on factors

unknown to the IEP team in December 2009, from the perspective that he was a child with autism, and without observing him during a regular class day or speaking to his teachers. (AR at 403.) Rather than judge an IEP in hindsight, the Court "look[s] to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [the student] with a meaningful benefit. . . . In striving for 'appropriateness,' an IEP must take into account what was, and what was not objectively reasonable when the snapshot was taken, that is at the time the IEP was drafted. Adams, 195 F.3d at 1149 (citation omitted).

The PEPers program focused on communication, social skills, gross and fine motor skills, behavior and pre-academics, all of which were listed areas of need for L.O. (Def. SUF ¶ 118.) The goals listed in the December IEP were based on the information the District staff had at the time, and the ALJ found that Ms. Stinson was persuasive in establishing that the goals listed were realistic and met L.O.'s needs, and the evidence in the record supports these findings. (AR 399-403.) The PEPers program also included parent education and participation, which facilitated the use of the strategies used in school at home and addressed L.O.'s parents' separation concerns. (Id. ¶ 115.) L.O.'s May 2010 progress report shows that L.O. did

make some progress on his goals during the school year since starting early December 2009. (AR 807-812.) The evidence also supports the ALJ's finding that L.O.'s parents were advised that the more intensive PAWS program would be better for L.O., but L.O.'s parents chose not to place him in that program at least in part because they were concerned about the separation. (See AR at 433.) While the Court understands that L.O.'s parents were disappointed with the progress he made while enrolled in the Little PEPers program, the IDEA does not require school districts to "maximize each child's potential commensurate with the opportunity provided other children," it requires that they "enable the child to receive educational benefits." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176 (1982). The Court finds that there is sufficient evidence to support the ALJ's finding that the District constructed an individualized program tailored to meet L.O.'s specific needs for the 2009-2010 SY, regardless of the eligibility category he was placed in.

**Refusal to Separate**

Plaintiffs argue that the District did not properly address L.O.'s failure to separate. (MSJ 17-19.) When a child has a behavior issue that impedes his or her learning, or that of others, an IEP team must consider

"appropriate strategies, including positive behavioral interventions, strategies, and supports to address that behavior." 20 U.S.C. 1414(d)(3)(B)(i). "An IEP that does not address appropriate[] behavior that impedes a child's learning denies a student a FAPE." W.A. ex rel S.A. v. Patterson Joint Unified School Dist., No. 10-1317, 2011 WL 2925393, at *11 (E.D. Cal. July 18, 2011.)

The Court agrees with the ALJ's conclusion that the District adequately dealt with L.O.'s separation issues, and the District did not deny him a FAPE by failing to appropriately address his separation issues. L.O.'s mother provided testimony that L.O. would tantrum 90% of the time she tried to separate from him. Ms. Stinson testified that L.O.'s difficulty separating from his mother was more inconsistent than L.O.'s mother described, and he would cry and then recover. (Tr. 1899:11-1900:8.) The ALJ found Ms. Stinson's testimony credible. (AR at 405.) Additionally, Ms. Stinson used several strategies, such as successive approximations, to help L.O. separate from his mother, which were sometimes successful, but often were not successful. (Id. at 394; Tr. 1323:6-1326:5, 1899:11-1900:8.)

**<u>Speech and Language Therapy</u>**

Plaintiffs also assert that L.O. could not have received the 25 minutes of speech therapy per session that the December 2009 IEP outlined while he attended the PEPers class because the speech therapy was provided in a breakout session when the parents separated from their children, and the testimony established that he usually would not separate at all. (MSJ at 32.) Ms. Stinson and L.O.'s mother provided somewhat conflicting testimony regarding L.O.'s difficulties separating, and the ALJ found Ms. Stinson's testimony credible. Additionally, there is evidence that Ms. Stinson used strategies such as having L.O.'s mother stay in the room, but not engage with him. Plaintiffs have not offered any persuasive evidence to demonstrate the District failed to provide L.O. with appropriate speech and language therapy during the 2009-2010 SY.

**2. 2010-2011 School Year**

**<u>PAWS Program</u>**

The administrative record supports that L.O. was provided with meaningful educational opportunity and benefits while he was enrolled in the PAWS program. The PAWS program provided for three hours of class a day, five times a week. It focused on developing

social skills, behavior, communication, gross and fine motor skills, and pre-academics, which were all consistent with L.O.'s needs. (Def. SUF ¶ 184; AR 813-828.) Additionally, the PAWS program was taught by Mr. Cooper, who was certified to teach children with autism, and included children with both speech and language impairment, and those on the autism spectrum. (AR at 933; Def. SUF ¶¶ 180-182.) The evidence shows that during his time in the PAWS program, L.O. made progress on the vast majority of his goals, he became a more active participant in class activities and instruction, and he began to speak with both peers and adults. (AR at 595-600.)

**Refusal to Speak**

Plaintiffs assert that the District should have developed a behavioral plan in order to determine why L.O. was not speaking, and address this behavior. (MSJ 26-32.) Section 1414(d)(3)(B)(i) provides that the IEP team shall "in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(I). The evidence demonstrates that L.O. was provided with services that addressed his social issues, and the IEP specifically identified communication, social skills, and behavior

as areas of need and included goals for those areas. (AR at 519-536; Def. SUF ¶¶ 184, 185.) Additionally, the progress reports showed that L.O. was making some progress in speaking to his peers and adults. Therefore, the Court finds that Plaintiffs have not met their burden of showing that the District did not adequately address L.O.'s reluctance to speak.

**Speech Therapy**

Plaintiffs also assert that the District did not provide L.O. with appropriate speech and language therapy during the 2010-2011 SY. (MSJ at 32-36.) The ALJ found that L.O. did not establish that the District failed to provide him with appropriate speech and language services, noting that L.O.'s parents' lack of cooperation with the District and failure to respond to requests about additional information about his speech at home left the District with a dearth of information about the specific type of speech and language services L.O. required. The ALJ pointed out that the lack of Wednesday attendance deprived L.O. of the additional speech and language services. (AR at 438-439.) Plaintiffs argue that because the District did not provide an FBA to determine why L.O. refused to speak, it was not able to work on improving articulation. Additionally they argue that it was unreasonable for the ALJ to rely on any lack of cooperation on the part

of L.O.'s parents since Mr. Peck testified that he was aware that L.O. had articulation issues as early as 2009, and L.O.'s articulation difficulties were mentioned by his parents during the December 2010 IEP meeting. (MSJ at 33-34.)

As discussed above, the Court does not find that Plaintiffs have shown that the District was required to conduct an FBA on L.O. Under the December 2010 IEP, L.O. was to receive seven 25-minute sessions of group speech and language services a month. (AR at 532.) L.O.'s father was informed in October 2010 and December 2010 that one of L.O.'s two weekly speech and language therapy sessions would occur on Wednesdays, and this fact was reiterated at the team meeting. However, L.O.'s parents both worked outside the home on Wednesdays and could not transport L.O., and did not arrange for alternate transportation although District transportation was available. (AR at 415, 419.) Additionally, L.O.'s parents were not responsive to Ms. Castro's requests to discuss L.O.'s speech. (Id. at 419.) Plaintiffs have not provided evidence that the District was not offering appropriate speech and language therapy based on the information they had.

**3. Home Behavior**

Plaintiffs argue that the District failed to meet its obligation under the IDEA and California law to

address L.O.'s behaviors at home. (MSJ at 39-40.) The District responds that the District provided counseling, training, advice, when it was aware of the issues.[5] (Opp. at 40-41.)

After L.O.'s parents reported tantruming and noncompliant behaviors after the family's trip to Disneyland during the 2009-2010 SY, Ms. Stinson discussed her concerns and provided strategies to address those behavioral issues. (Def. SUF ¶ 143.) Similarly, after L.O.'s parents informed the District that there were behavioral problems at home during the December 2010 IEP meeting, Mr. Peck gave L.O.'s parents guidance for dealing with those behaviors, and when the issue came up again in April 2011, a behavioral specialist contacted L.O.'s mother to discuss the possibility of mental health services, which L.O.'s parents were reluctant to use. (Id. ¶¶ 209, 256-258.) Additionally, although L.O.'s parents continued to report tantruming at least once a day at home, Ms. Sullivan's September 2011 in-home assessment reflected that she did not observe any tantrums. (Id. ¶¶ 325, 326.) Thus, the Court finds that the evidence supports

[5] The District also contends that this issue was not decided by the ALJ. (Opp. at 40.) The Court disagrees; the ALJ addressed whether the District failed to provide appropriate behavior interventions in the home for the 2009-2010, 2010-2011, and 2011-2012 SYs.

the ALJ's finding that the District did not fail to adequately address L.O.'s behavioral issues at home.

## V. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' Motion for Summary Judgment. Judgment is entered in favor of Defendant.

Dated: April 21, 2014

Jesus G. Bernal
United States District Judge